As I indicated, the next case is 513-0132, Country Mutual Insurance Company v. Santel Construction Company. Mr. Wilson? Thank you, Your Honors. I am Michael E. Wilson. May it please the Court. I represent Care Brothers Construction, who owns some of the contents in the fire that was involved in this case, and Joseph and Dawn Care, who are the owners of the physical property, the real property. And in addition, there were other plaintiffs that they were disposed of either prior to trial or by settlement. Disposed of? That sounds... Well, I think we're probably going to hear that word in connection with the screw that was involved in this case as well. I suspect Your Honors have read this, so I have a brief... or brief, but I will briefly go through the facts to lay out the background to what I think is a couple of basic, straightforward issues to address. Plaintiffs Dawn and Joe Care hired defendant Santel Construction to make improvements to what had been a pole vault. And the pole vault had a simple construction. It had an exterior skin of sheet metal, two-by-four horizontal purlins or wood members, and the poles themselves providing the structural support were six-by-six members. Two-by-fours is a misnomer. We all know that. I think it's common knowledge they're actually an inch and three-quarter by about three-and-three-quarter. So you have the horizontal purlins running this way and six-by-six running up, and it leaves a gap, if you had something on the inside, of about seven-and-a-half to seven-and-three-quarter inches. Joe and Dawn decided that the Care Brothers business that they own and operate has a race car division, if you will, and that's one of the ways they market their business. It's a roofing business. And so they decided to turn this pole barn and property that they purchased into a garage facility. There were various other improvements that Santel Construction did, but I'm going to focus on the ones that we think are pertinent to the fireplace. Santel, as part of this construction, installed sheets of insulation board or insulation sheets, and there are actually two sheets, thickness, that were installed inside the wall space. And I'm going to focus on the west wall, which is, there's no dispute, that is the origin of the fireplace, along the west wall. There's a dispute over cause, but not as the origin, the place of origin. And so as part of that work also, in order to provide more support primarily for that insulation, and also to provide a backing for the interior finish that was put on, which was a metal interior finish, two-by-fours were installed vertically between each of the six-by-six members supporting the pole barn. I have a question. Were the two-by-fours installed between or on top of the six-by-six? The evidence, I think, says between. I don't recall any evidence indicating the two-by-fours were on top. It would make the wall space even thicker, and they wouldn't have had to angle the screws. And I think the evidence is from Mr. Santel himself, they had to angle the screws. So where were the two-by-fours, how were they attached? They were attached somehow, and I don't think the record supports that, so I'm going to be speculating. I think they were attached top and bottom. I couldn't figure that out either. Top and bottom. Okay, but they were definitely between the six-by-six supports. Okay. So, and to sort of bring that assembly together, screws were provided by Santel Construction to screw in from the two-by-four on the interior, and actually I think through the metal skin on the interior, through the two-by-four, through the insulation, and to the horizontal purlins. That was the concept, to bring it all together. So, unfortunately, in our view, of course, there is disputed evidence in the record, and it's a jury trial, and the jury ruled in favor of the defendant. But there is evidence in the record to indicate that the height was at about six feet that these screws were put in. The record's very clear that the 220 circuit, which was a clear view to Santel Construction, because that was put in before the insulation, put in before the interior two-by-fours, it's clear from that record that they were put in about six feet high. That's where the 220 line runs across the top of the two-by-four at the back, if you will, toward the exterior. So that's sort of the backdrop that's important to understand. And did the electric run over the top of the horizontal board? It was stapled atop the third rung of the horizontal purlins at the top, and loosely stapled according to Mr. Santel. That was his testimony. Prior to Santel's performance, the 220 was added. As I mentioned, there was a clear view. Santel chose the eight-inch screws, and he chose to angle them so he wouldn't penetrate the exterior skin. It wouldn't require a lot of angle, but a slight degree of angle. We all took geometry to figure out how much that was. But it was basically at the six-foot level, which was the problem. Just prior to the fire, tire racks had been installed on the west wall. The construction that Santel did occurred a couple of years prior, so one would think, how could this happen? But, again, when you deal with a negligence case, the court's very familiar with the proximate cause doctrine. There only has to be a proximate cause tied to the negligence, not the sole cause. In any event, the tire racks were installed, and the night before, the race team came back from Care Brothers, for Care Brothers Construction, and they typically tossed the tires onto, in this case, they loaded the tires and tossed them onto the tire rack. And this building wasn't built like the Taj Mahal. It's a pole building converted, and it had flexibility in the walls, so the walls would move. On March 21, the day after the night they returned, a fire at the Cares garage was reported,  I think it's important to understand, it's undisputed in the record, that they came back twice. And I think that if one ties all the evidence together, one understands how one could see the wire there and the screw in the wire, and then a second time, because firemen, their number one job, I think we can take judicial notice, their number one job is to suppress the fire, not to preserve the scene of the fire. No photos at all at that time? It's unclear from the record whether the photos taken by the fire chief were after the second trip or the first trip. There's no evidence to establish one way or the other. So on that day, there was a fire that came back two times, and the experts don't disagree, like I said, as to the origin. There's a clear V, which is classic for a fire, that spreads from the point of origin and upward. And the V, at the end of the V, is in close proximity to where the screw hole was on the vertical member and across the 220 member, where there is some testimony that's very hotly contested that the screw was laying on top of the 220 or penetrating the 220. There were two experts that testified at trial. Mr. Truss was called on our behalf, and Mr. Helmkamp was called on behalf of Defendant Santella Construction. Mr. Truss opined as to probable cause that it was the screw penetrating the 220, which caused a spark, which in turn caused the fire. Mr. Helmkamp was unable to testify as to probable cause. He had different possibilities, I would say theories, but he had different possibilities. That was Defendant's expert. Pardon? Was that Defendant's expert? That's Defendant's expert, Mr. Helmkamp. Mr. Kerr testified that he saw the 8-inch screw penetrating the 220 wire. I think it's significant in the record. This case isn't so much who's right or wrong, whether the jury, whether there was substantial evidence to support our view or their view. This case is over whether there was an instruction that should not have been given that prejudiced and confused the jury. But it is important to understand the backdrop that there was evidence that supported our position, not that this case would have been decided in favor of Defendant even without the instruction. And that's the only point I'm trying to make here. The fire marshal, the Germantown fire chief didn't remember if he'd seen, and he testified to this at trial. In fact, he testified to this in deposition. He didn't remember whether the screw was penetrating the 220 wire. But a contemporaneous report by the fire marshal shortly after the fire stated that that's what the fire chief, the Germantown fire chief, told the state fire marshal. It was penetrating the 220 wire. So we have corroboration for Mr. Kerr. And as I said, we don't know exactly what happened, so I'm going to stress that. But there were two attempts at suppressing it. So there could have been a wire across, and then there could be a wire hanging down, which is what JNR's president testified to. He saw the wire hanging down. But he also said he pulled the wire up, and the place where he saw a nick in the wire was at the same place where the screw was. So it wasn't clear from his testimony whether the screw was still there. So with all this backdrop, as part of our evidence, we asked Mr. Truss to bring in the screw that he located during the inspection, which was after Mr. Kerr had found the screw. Mr. Kerr found the screw. He was curious. He testified he was curious. There's no evidence that he's ever had another fire, that he's an expert in how to deal with fire investigations. He was curious. He pulled the screw out, and it's uncontested. He discarded it on the ground after he pulled it. In retrospect, we all wish he hadn't have done that, but he did. That's a fact. And it made for a fight over the spoilation claim, and I respectfully submit to the court a lot of the arguments in this case are impertinent to this missing instruction issue that we're raising. They're pertinent to the spoilation issue that we have won. The trial court dismissed that spoilation claim, and no cross-appeal has been taken. So it's res judicata that there is no spoilation to be concerned about. Is it true that Santel Construction was involved in the cleanup? It is true. And so they had access to this whole barn at the same time Mr. Kerr had access? They did. They did have access to it, and they helped clean out primarily the interior, but they had access around the building. And how did they access the screw then that they claimed was the screw? Well, I think there's no dispute in the record that Mr. Kerr pulled the screw out early and put it on the ground. I don't know the timing in terms of when Santel started the work. I don't think the record's clear as to when Larry Santel's firm immediately started that work. Well, then I'm unclear on how the first prong of the 501 instruction, that is the presumption that it would have helped or harmed the plaintiff. I'm not sure how the court got around that. I'm unclear about it too. One of our second major points is there's no foundational basis to tender this instruction. Our first major point is that the screw was produced at trial. We produced it, and they took the position. We did disagree about that. But you claimed partly that it wasn't the screw. We did. But defendants took the position that it was. And to me there's a showing, there's a preliminary showing that has to be made to the trial court that the screw, that the evidence is missing, and instead they take the position this is the evidence, it's here in the courtroom. I don't think you can take the contrary. It's incongruous to then say, Judge, go ahead and submit the missing instruction, missing evidence instruction. It seems to me that you've got a choice, and you've got to make a hard choice, what your theory of the case is. And plaintiff and defendants try to have their cake and eat it too, in my view, is the right expression. But the fire marshal, Mr. Kerr, and the individual from the electrician, were they ever asked about the screw and how it might be the screw in question? Well, I don't think the fire marshal formed an opinion as to probable cause. I don't think he had an opinion on that. He had an opinion on an origin. Mr. Kerr is not competent. He's a smart guy, but he's not competent to determine probable cause. No, but you can say, look at this screw. It's a seven and three-eighths inch screw. Does it look like the screw you pulled out? He wasn't asked that question, but they're all the same. They all look similar. So it's not like there would be something that would make it especially earmarked. Unless it had arcing on it or something like that. I think that's a misnomer. I think we can take common knowledge and apply it. And the function of arcing is when you melt, is going from one conductor to another. Whether those conductors melt in the process, they don't have to. I can take two wires, connect them to a battery, and the wires don't melt, and I can cause a spark, and the spark can cause a fire. I think that's a misnomer or a red herring. But in any event, I think the missing instruction, missing evidence instruction, doesn't belong because they took the position. You can't say this is the evidence we were looking for, and it's here at trial. We were arguing about it, and then say, Judge, go ahead and tender the instruction. And as I said, the other factors in terms of the foundation, there was nothing to suggest in this record that Mr. Kerr looked at the screw and said, Oh, my God, this is horrible, and I better get rid of this. There's nothing to suggest that the screw was nothing more than a normal screw that he pulled out of the wall. And so there's no foundation laid under the four-factor test. The notes to use say, before giving this instruction, I'm going to insert the word evidence instead of the words in the notes for use, witness slash document. Quoting, before giving this instruction, the trial court must first determine that in all likelihood, all likelihood, a party would have produced the evidence under the existing facts and circumstances except for the fact that the evidence would be unfavorable. There was no showing by defendant that the evidence was likely to be unfavorable. Most of defendants' arguments go to failure to preserve the scene of the firing and the failure to take pictures, and all are spoliation issues, not as to whether or not we failed to produce missing evidence at trial. Well, the screws all would have been the same, presumably, except that I guess there's the issue whether or not the screw in question could have been, had showed damage of arcing or something to do with the actual initiation of the fire, right? That's correct. So there is a difference there. There is a difference there. It would depend on whether or not, we have no evidence, though, of that even the screw that was taken out, the evidence is there's no evidence of arcing, but that doesn't conclusively establish it was not the screw. But if there was arcing, it seemed it would be favorable to the plaintiff, not unfavorable. Again, I think I'm taking it from the perspective of my client, who is not an expert and didn't know. No, but I mean, under 5.01, you have to show that they didn't produce it because the inference is it would have been unfavorable. And my reading of 5.01 and intent is that the party recognizes that it's unfavorable, and that's why they don't produce it. Exactly, but you actually had several witnesses who saw the screw or who believe the screw caused the fire. So I'm trying to find out what the judge had going through his or her mind about that first prong under 5.01. The judge had several opportunities, our Judge Becker, had several opportunities to make a record to tell us what his thinking was. What he basically said, he came to the conclusion, he said, I'm not going to, first of all, I said I'm leaning towards dismissing it, but he didn't. But ultimately, just before trial, he did dismiss the spoilation claim. But he said, I'm going, I'm thinking early on, he said, I'm thinking about tendering 5.01. But he never explained the four-element process of why he thought those four elements, it could be conflicting evidence, but there's evidence to support each of those four elements to be able to tender it to the jury. And I don't think there is, as we've stated in our group. So I think the evidence was produced, or at least according, I don't think the defendant can take the position the evidence was produced, but I still get my cake and eat it too. That way I can also have the adverse inference that either Santel was not negligent or did not cause it. And by the way, invited error doctrine doesn't apply. This is not, we didn't invite, we asked that the instruction not be tendered. So we didn't ask for that instruction. The defendant did. And when the jury makes a decision, if they thought, they had this opportunity from the instruction to say, well, it couldn't have been Santel, either it wasn't negligent or didn't cause it, then that goes to all the plaintiffs. It doesn't matter whether the instruction was directed toward one. It has the same prejudicial impact on all the plaintiffs. So for all those reasons that we've indicated to the court, we respectfully submit that we should have a retrial without the instruction and let the jury decide upon the merits of those facts. And I think it was a case that would have been interesting to see that decision, and we believe likely would have been a different outcome, but for an instruction that basically tied our hands. Thank you. Thank you. Mr. Wilkie. Good morning, guys. Good morning. I would like to start by pointing out at the instruction conference, and this is at T-1407 transcript, no objection was made that the screw was present in the courtroom and therefore you couldn't tender the 501 instruction. But you never admitted that that was the screw. We actually, there was two different possibilities. If it is the screw that was in the building that Mr. Carrick had seen in contact with that wire, if that's the screw that was actually there physically in the courtroom, it was undisputed that that screw did not cause the fire. Rob Helmkamp is the only person who looked at it and testified there's no arc damage on the screw that was shown to him by Mr. Wilson, and therefore the screw that's in the courtroom is not the cause of the fire. Could you repeat that one more time again? So you're saying to this court today that the screw that you held up and waved around was definitely not the screw that caused the fire. It wasn't the cause of the fire. We dispute that it was even the screw that caused the fire. But the question is, was the screw that you were waving around, I thought you said, what's the only screw that was missing? It's the screw that they say caused the fire, and guess what? It did not cause this fire. That's correct. There were two possibilities. How could that be unfavorable to you, then, if the screw didn't cause the fire? Well, this actually goes to the prejudice point. Let me address, I think, the first question that was had. There were two possibilities, at least. There's actually five possibilities, according to their expert, as to what caused the fire. One was a misdriven staple that would have gone through the wire, and over time that would have caused the fire. And this is according to their expert. He agreed that could have been it. The problem was the staple was missing from the area. Either it had been blown off during the event or had somehow melted or otherwise gone missing. So that's gone. But we know it's a possibility. And nobody's contending that somebody tampered with that? No, because at least there was no evidence during the trial that that staple was taken out by Mr. Carroll. The other possibility was that a screw, we all admit there was a screw in the area. It's like we all agree that there was a staple in the area. The screw that was there, if what they're saying now, today, for the first time, is that that screw was, in fact, the screw that actually appears in the courtroom, we can know definitively that that screw did not cause the fire, that it was some other cause. The screw was the only thing we were blamed for. The Santel Construction said, you misdrove the screw, therefore, you were liable for the spot. But how is it if they had brought the other screw in that you say was foiled, that would have been unfavorable to them? The real problem is that he goes in and not just that the screw actually shows up in the courtroom. It's the fact that the screw is sitting there in space, allegedly in contact with the wire. He doesn't just pull it out. He actually has to physically rip the 2x4, rip a second 2x4 to get the screw out. He then drops it on the ground. At that point, Rob Hellenkamp says, you cannot tell exactly what caused this fire because he so badly interfered with the state of the scene of the fire. There's a case that's in IPR called Kane. It is a rape case. It's a truly horrible case. There was an adult woman who was raped at a summer camp. Mom, when she gets to hold a daughter again, takes the underwear that has blood and semen on it. She washes it in the washing machine. That underwear actually does show up in court in Kane. The same underwear. However, because Mom has washed the underwear away, she's so badly tampered with the evidence that there's no way to tell for sure what that underwear would have shown. Would it have shown semen? Would it have shown blood? In this particular case, it's very similar. Yes, the screw shows up in court. However, because the placement of the screw, where it was, wasn't misdriven into the situation. By the way, the screw showed up in court. What do you mean by the screw, then? We're talking about the underwear and the screw. Correct. We know that there was one screw, one screw only, that was driven at approximately six feet, a little bit higher than six feet, into the outside of her leg. We know that there was a screw. The question is, is that screw, because there's only one, was that the thing that actually caused the fire? But in your closing, you say it is. You say that this screw is the screw. The screw from the area of origin, that is correct. You see, you say that screw is available. Let's look at it. Here it is. And then the next breath, you say, but this is not the screw that started the fire. It's not the screw that started the fire. How do you get a missing witness instruction if you've got the screw? And your defense is, but it didn't cause the fire. Because if it did, it would have arcing on it. That is correct. How do you get the 501? Ultimately, by him tampering with the scene, by him actually physically ripping the two-by-fours down. We're not talking about the screw anymore, then. We're talking about the original scene. That's always been my argument from day one. It wasn't that the screw itself was missing. It's that he removed the screw by physically tearing down two-by-fours. That has been my argument since day one. So how do you get a 501? You have to meet certain criteria. That is correct. The first of which is that the evidence would be, is unavailable. The first of which is the evidence is unavailable. But you have the screw. You admit you have the screw.  And I don't think it's any different. Because the underwear in the original context, with all the blood and semen on it, that was what made that good evidence, and that the plaintiff would have introduced it into evidence with testing and everything else, if it had been figured. But you have the screw, and you're able to show that it wasn't the cause of the fire because it doesn't have arcing on it. So how are you prejudiced? Ultimately, plaintiff's counsel decided to deny that that was the screw. The jury very easily could have been in this situation. The jury goes, we hear Mr. Wilkie's argument. But we believe that that screw that's in the courtroom is not the screw that was six feet off the ground in the area where it was. We think that there's another screw out there that is missing. And Mr. Wilson invited that belief in the jury. He cross-examined people on that point. They did not object to this point. Ultimately, That is correct. I mean, circumstantially, that wasn't a very popular belief when you're saying this is the screw. When you cross-examined their experts saying, wouldn't you have liked to have this? And he certainly said, yes, I wanted to see the screw. And yet he denied that the screw that he was holding in his hand, the one that Mr. Wilson brought to the courtroom, he denied that it was the screw in the area of origin. That was very much a dispute. I guess my concern is you still took the position it was the screw. But the 501 is for missing evidence, missing witnesses. That's my problem. I'm having a tough time getting past those four criteria. Sure. If... And I'll look at the case. Well, and I guess this is my point. By plaintiff's counsel denying that the screw that's in the courtroom was the screw that had been installed by Santa, by them denying that, they have now placed at issue whether or not that screw was not only the cause of the fire, but too was in fact the screw in the area of origin. If the jury believes Mr. Wilson, if they believe his point, the plaintiff's point, that that screw was not the one from the area of origin, there's some other screw that's simply missing that we haven't accounted for, the 501 instruction makes perfect sense. Because now the screw's not in the courtroom. But if the jury does believe, my defense, that the screw is the one from the area of origin, then they ignore the 501 instruction and proceed on the basis of the other instructions. Ultimately, that is a prejudice issue. Mr. Wilson, by taking that position, by saying, this is not the screw, this is not the screw, and then coming in here and saying, oh, but it was the screw. He needs to be judicially stopped. If the court decides to go ahead and send this back, he needs to be stopped in the next trial from denying that that is in fact the screw from the area of origin. By him denying, he did put us into a bind. And I think the jury as well. But ultimately, if there's a theory in the case that's not only pled, but also argued by plaintiff's counsel, that that screw that's in the courtroom is not in fact the screw that we're talking about, then I think the 501 instruction still needs to be submitted. A judge would ask about, I think, prong three of the instruction, which is a reasonably prudent person in the same or similar circumstances would have offered the evidence if he believed it to be favorable to him. Ultimately, what we're looking at now is we're looking at whether or not Mr. Kerr would have introduced this screw if he believed it was favorable to him. Would a reasonable person that saw a screw going through a wire and believed it to be a wire that had caused the fire, that had caught his entire place on fire, he admitted he knew this barn was terribly uninsured or underinsured. He knew that someone was going to have to be blamed for it. In fact, he testified later about bringing both Shoemaker, who's J.R.'s client, the one who drew the staple in, and bringing my client in and saying, one of you is paying for this. So he knew it was important. That evidence is in the case. If he had honestly saw that, like he testified he did, he would have done something to preserve it. He would have brought Jim Shoemaker over to go look at it. He would have brought the fire marshal, the fireman who was on the scene over to come look at it. He would have brought my client who was on the scene within two hours to look at it. He would have taken a camera and taken a picture. Isn't that... Well, doesn't that go to the issue of spoilation? I don't think it does. Just to preserve it. He certainly didn't have a duty to take a picture under 501, did he? No. Does 501 require creating evidence? It does not. But here's what's important. If he had done that, if he had done that, the 501 instruction wouldn't have made sense. Because at that point, he's no longer destroyed the evidence. 501 is a statement. It's an evidentiary statement. It's not actually a punishment by the court. It's a long-standing principle, as far as I can tell from reading the IPI, that if someone does this, the jury is allowed to make an inference that the reason they did it was because that evidence wasn't favorable to them. Because they would have brought it in otherwise. They would have done something to show it to the jury. That's why I asked how quickly Santel was on the scene. You say 2 hours. It was within 2 hours of the testimony. They were on the scene looking for the same exact evidence that Fire Marshal was. By that point in time, Mr. Kerr testified that he had already removed the screw out of the fire station. He had already removed it and ripped the 2x4s down. So your people picked it up? Ultimately, it was on the outside of the building. And no, it was not picked up until the fire inspection over a week later. That was the first time that that screw was found on the ground. But let me talk about prejudice in this way too. Ultimately, the plaintiff has the burden, all 3 plaintiffs in this case, have the burden to establish that they were prejudiced by this instruction. Because if the court did err, because either the missing evidence was the fact of the crime, or the court erred because they didn't find the one problem, ultimately, plaintiffs have to show what would have made a difference in the outcome of the case. What you have to remember is that there's actually 3 plaintiffs. Joseph Kerr is the only one of the 3 plaintiffs who was accused of, and it was argued that, he tampered with the evidence. There was no allegation and no statement by me or a witness that somehow the corporation had tampered with evidence and therefore you need to draw an adverse sentence. There was no statement that Don Kerr had tampered with the evidence and therefore you should draw an adverse sentence. Juries are assumed to have followed the instructions that they were given. In this particular case, the 501 instruction only allows the jury to draw an adverse inference to that party who fails to offer the evidence. That's why my closing argument is important in this case. Because it demonstrates that Joseph Kerr is the only one the jury could have taken and used this adverse instruction against. How were the verdict forms created? Were they separate? Or was everybody together? They were all together because that's the way the plaintiffs submitted them to the court. Had plaintiffs chosen to submit them separately, they could have done so. But they chose not to. So when the jury looked at the verdict form, they saw all 3 names, either all or nothing? That is correct. But that is the choice that plaintiff's counsel made by submitting it to the jury in that particular way. Had there been a question, the jury could have asked and allowed it. Logically speaking, that means the jury did not use the adverse instruction in order to reach this verdict. Because then they would have come back in favor of Don and the corporation and against Joseph Kerr. It's the only way it makes sense logically. I was trying to jot down notes as you were asking them before, so let me go through and see if there was anything else we didn't answer already, Your Honor. This is the other prejudice argument. The screw that's in the courtroom. If that in fact is the screw that was the one that Santel drove from the interior of the building to the exit, that's the screw that was in the courtroom. It was undisputed, there was no other evidence that the screw that shows up in the courtroom could have been the cause of the fire. Again, logically speaking, that means something else caused the fire. There wouldn't have been arc damage on the screw. I hear Mr. Wilson who made the same argument to the jury that it's common sense. The problem is that both experts, both electrical and cause experts, testified that if this screw caused the fire, if any screw had caused the fire, there would have been arc damage on the tip of the screw, where it made contact with a 220-volt circuit. No ifs, ands, or buts. It would have made arc damage. Ultimately, if the screw that's in the courtroom was in fact the screw that Santel drove, then Santel did not cause the fire because there was no arc damage on that screw. Again, lack of prejudice. Even if the court did make an error, there's still no prejudice. The jury could not have come back logically and said, oh, the screw's in the courtroom, therefore, because that screw did not cause the fire. Thank you. Thank you. Mr. Wilson? Anything you want to conclude with? Pardon me, how much time do I have left? Five minutes. Thank you. Yes, thank you, Your Honor. Your Honors. Let me take it, not in the same order necessarily, but let me go to the last point and start on that. The evidence, I think, of careful review of the record indicated that Mr. Truss did not testify that there would have been arc damage. He was our expert. There may have been arc damage. There's a big difference between may and would have been. And the jury is entitled to, if they don't have this negative inference, which the jury could easily find that, on the issue of causation, make the adverse inference, and they're done with their analysis. The jury could use common sense, just like I tried to argue to them, that there's not necessarily going to be damage to the conductor even when there's a spark. And that's common day knowledge. It doesn't happen every day, but I've seen it, and I think many jurors have seen it, that you can have a spark without damage to the conductor. We, the problem with, one of the fundamental problems with defendants' position is they not only asked for the instruction, but they submitted the evidence to say this was the screw. Yes, we contested it, but Mr. Santel got on the stand and said there was only one screw in the area that was missing on the west wall. Mr. Truss got on the stand on this point and said he used his metal detector and he found only a single screw. I think there's a very strong inference that's the screw. Now, for them to then argue, they put the evidence on to say this is the screw, so he could argue, ah, the screw is in the courtroom, but then they can't have the 501 instruction. It's an either-or proposition. It's an alternative proposition. You cannot have both. Prejudice. I made this point before, so I won't be redundant. I'll just say it one line. If the jury finds an adverse inference of no negligence or no causation, all plaintiffs suffer, period. End of story. This argument about drawing the line between it made no difference whether the instructions were separately packaged on that point. The result would have been the same if the jury came to an adverse result, that defendant wasn't negligent or defendant didn't cause the fire, and plaintiffs lose. There's some evidence that the record shows is not there, doesn't support the argument the defendant made. There's no evidence that within two hours Joe Kerr pulled the screw out. The timing of that is unclear from the record. Mr. Kerr didn't remember exactly when he pulled it out, so it's not within two hours. As to whether he did it before Mr. Shoemaker got a chance to see the scene or after, that's unclear. There's no evidence he ripped the board apart, the horizontal burlap, which if the screw is resting on top, there's no reason to rip it apart. There's no evidence that the board had any screw penetration, but there's no evidence he ripped it apart. As I said, it's just as likely that the fire department the second time came along and ripped out more to get to the cause of the fire. So if I were them, I don't think they'd suspect anything. The point is there's no evidence that Mr. Kerr is the one who caused that. I do sense that a lot of the arguments we have here today go to the point, and reading the facts and what Mr. Helmkamp said, I would have loved to see the screw. I wish it was preserved in the condition it was. I would love to see it in the wall. And I think all of us, all of them would. But that goes to a spoilation. It doesn't go to whether the screw was presented, whether it was missing or not. And in terms of the judicial estoppel argument, it was not raised in the theory of judicial estoppel as somebody prevails on their claim and then tries to take an inconsistent position in another type of case where the same issue is raised. You can't do that. All we're saying is we would like to have a fair trial. We believe in instruction prejudice, the plaintiffs, and we'd like to have an opportunity before a jury to present the evidence and let them make a decision on the evidence and not on an instruction that was clearly error and an abuse of discretion under the circumstances. Thank you. Thank you. Okay, we'll take this matter under advisement and we'll be in short recess.